FECHHEIMER *et al. v.* BAUM *et al.*

*(Circuit Court, S. D. Georgia, W. D.*   January 3, 1889.)*

1. COURTS—FEDERAL JURISDICTION—FOLLOWING STATE PRACTICE—EQUITY.
   The courts of the United States sitting in equity may administer, in suits of which they have jurisdiction, equitable rights peculiar to the laws of a state where the courts are held.
2. SAME—INSOLVENCY—RECEIVERS—RIGHTS OF CREDITORS.
   The fact that the local statute provides that a creditor of an insolvent trader, or firm of traders, whose debt is mature, unpaid, demanded, and payment refused. may ask for a receiver, is an exception to the rule making the existence of a lien a prerequisite to such an application.
3. SALES—FRAUD—RESCISSION.
   A person not intending to pay, by inducing one to sell him goods on credit through the fraudulent concealment of his insolvency, is guilty of a fraud which entitles the vendor to disaffirm the contract, if no innocent third party has acquired an interest in the property.[1]
4. SAME—FRAUDULENT REPRESENTATIONS.
   Where a firm of traders in May make a statement to a commercial news agency, (Bradstreet's,) showing entire solvency, which statement is intended

---

[1] Where a purchaser obtains goods on credit by false and fraudulent representations as to his financial ability, and not intending to pay for the goods, the seller may rescind the sale and retake the goods within a reasonable time after discovering the fraud. Lee v. Simmons, (Wis.) 27 N. W. Rep. 174, and note; Taylor v. Mississippi Mills, (Ark.) 1 S. W. Rep. 283, and note; Doane v. Lockwood, (Ill.) 4 N. E. Rep. 500, and note. See, also, Wollner v. Lehman, (Ala.) 4 South. Rep. 643, and note.

to be circulated among merchants selling goods upon credit, and which states that there are no liens or mortgages upon their assets, and that they give no security for borrowed money, except farmers' notes as collateral, and in December it appears that they are in debt more than $150,000, and utterly insolvent, and that at the time of their statement they had made a written promise to execute mortgages to a favored creditor upon their entire assets, which promise was withheld from the news agency, and that their entire stock was subsequently conveyed by mortgage to such favored creditor, the entire transaction is fraudulent as to creditors who gave them credit on the faith of said statement.

5. SAME.

If the traders were insolvent at the time of their statement to Bradstreet, their statement of complete solvency, made "willfully with the intent to deceive, or recklessly without knowledge," is fraudulent, under the law of Georgia, as to parties who were misled thereby.

6. RECEIVERS—APPOINTMENT.

The facts stated by the bill and affidavits make this a proper case for the chancellor to grant the injunction sought, and to appoint a receiver.

(*Syllabus by the Court.*)

In Equity. Motion for an injunction and appointment of a receiver.

The bill before the chancellor was filed by the plaintiffs, residents and citizens of Ohio, against Baum & Bro., a firm doing business at Toomsboro, Irwington, and Dublin, in this district, to assert the right to an injunction and the appointment of a receiver given by the law of Georgia. Code, § 3149*a*. This section provides:

"In case any corporation, not municipal, or any trader or firm of traders, shall fail to pay at maturity any one or more matured debts, payment of which has been properly demanded of such debtor and by him refused, and shall be insolvent, it shall be in the power of a court of equity, under a creditors' bill, to which one or more of the creditors who have matured debts unpaid shall be necessary parties, to proceed to collect the assets, real and personal, including choses in action and money, and appropriate the same to the creditors of such traders, firm of traders, or corporation."

The averments of the bill made and sworn to conform to the requirements of the statute in all respects; and so far as they indicate the existence of matured debts due by the defendants to the plaintiffs, the demand for payment, its refusal, and the insolvency of the defendants, the averments are not denied. In addition, the bill alleges other facts not less important to the jurisdiction in equity. They are that on May 21, 1888, the defendants, Baum & Bro., made a statement to Bradstreet's Mercantile Agency, which showed a condition of prosperous solvency upon their part, which statement is appended as an exhibit to the bill; that plaintiffs, in the usual course of business, had knowledge of that statement, believed it to be true, and knew this before their merchandise was sold to the defendants; that the defendants owe $160,000; have made many fraudulent assignments and preferences; that some of these are given to favored creditors, upon the goods of the plaintiffs not yet paid for; that the plaintiffs' debts were created for a large stock of clothing, part of which is yet in possession of the defendants; that the purchase was made by the defendants with the deliberate intention not to pay therefor, and with no reasonable expectation that the defendants would be able to pay;

that the sales are void, and that the title did not pass; that the statement made to the Bradstreet's Mercantile Agency as to the standing and condition of the firm was made with intent to deceive the public, and especially the plaintiffs, and was a part of a scheme to defraud creditors who would extend credit; that the fraudulent preferences amount to $70,-000, which is larger than the annual amount handled in business by the defendants.

The prayer is for an injunction and receiver, and that goods purchased by defendants from plaintiffs be kept separate for the benefit of plaintiffs, and for a general judgment, and for general relief. The temporary injunction was granted upon consideration of plaintiffs' bill, and thereupon plaintiffs filed an amendment thereto. This prayed that H. M. Comer & Co., a firm of cotton factors of this district, be made parties; that the preferences to Comer & Co. are void, (they consist of certain mortgages to secure an alleged indebtedness of $35,000, given upon stock worth $43,000;) that in addition to these mortgages the defendants have transferred and assigned to H. M. Comer & Co. notes and accounts in a sum largely in excess of Comer's demand; that on August 22d these accounts were worth $50,-000, and plaintiffs charge on information and belief that these transferred choses in action have been increased by other transfers to $75,000; that since the mortgage and preferences were given, the defendants, Baum & Bro., have paid to Comer & Co. $18,000, which reduces their demand to $17,000, and yet Comer & Co. hold as collateral and otherwise in mortgages on real and personal property the full sum of $100,000 to secure this debt. This was stated on the hearing, without objection, to be $24,600, and the chancellor, for the present, assumes that to be correct.

The bill alleges that the transactions between Comer & Co. and the defendants were the result of a fraudulent confederacy to hinder and delay creditors, and to compel them to accept a small pittance in full satisfaction of large debts; that the demands of Comer & Co. should not be paid by the proceeds arising from the sale of the merchandise of plaintiffs and other creditors, not yet paid for; that Comer & Co. had actual notice of the defendants insolvent condition at the time of certain payments made to them from such proceeds. The amendment further alleges that, prior to the insolvency of the defendants, or at some other time, Comer & Co. obtained from the defendants an agreement in writing that when the defendants should become weak or insolvent that they would execute and make to Comer & Co. a mortgage covering their entire property, and should assign to them all of their notes, accounts, and choses in action; that said mortgages and preferences were given in pursuance of said agreement; that Comer & Co. permitted the defendants to retain possession of the notes and accounts and choses in action transferred to him; that the large amount of assets in the hands of Comer & Co., over and above their lawful demand, will be sacrificed to the injury of plaintiffs; that the defendants bought a large stock of goods on credit, with the intention not to pay for them, and to defraud creditors. The prayer is that Comer & Co. be required to produce the said agreement on the

hearing, and that they be enjoined from proceeding to foreclose the mortgage or mortgages, and that they be enjoined from collecting the notes and accounts, or from any way interfering with the assets of the defendants, and that a receiver be appointed to take charge of all such assets for the benefit of the creditors. The bill expressly waives discovery.

In reply to the motion for injunction, etc., the defendants Baum & Bro. deny, in their answers, that plaintiffs' debt was contracted after the financial statement was made; that they gave the statement of the 21st of May, yielding to the solicitation of the Bradstreet Company; that that there were no mortgages or liens at the time the statement was made; that the statement appended to the bill itself is erroneous; that their dealings have been honorable and successful up to the time of this failure; that their failure is a thoroughly honest failure; they have not made any preference upon which suspicion or doubt can be cast as to its entire good faith; that their creditors have given uniform evidence of their entire and unabated confidence in the defendants' integrity; that they have paid large amounts to their creditors, and have drawn out nothing from their business except for the necessary support of their families; that the mortgages were given to secure *bona fide* debts; and that, if a receiver is appointed, the loss in winding up the business will be so great that the creditors will get nothing.

H. M. Comer makes answer by affidavit. He states that on the 10th day of March, 1888, he took the agreement to the court shown, which was referred to in the bill. This had been done every year previously. It was taken in entire good faith, to protect the advances that deponent made. He gave the creditors knowledge of it on the 3d of December, and never attempted to conceal it. He denies utterly fraud and confederacy. That in his preferences defendants reserved no right or benefit to themselves. He never had any reason to suspect fraud on the part of the defendants. That in the spring and summer of 1888, before he knew defendants were embarrassed, they sent to him notes and accounts of the face value of $43,263.45, as collateral for about $27,000 then due. These notes and accounts he sent to the defendants to collect for him. This collateral was more valuable than that obtained in November. Then the debt was increased, and Comer & Co. took by transfer the notes and accounts referred to. Another affidavit was presented by H. M. Comer. It recites that his firm are cotton factors and commission merchants in the city of Savannah; that they have been the factors of Baum & Bro. and Baum & Co., the defendants, for five years; that they would make advancements in the spring and summer with the understanding that they were to be paid off in the fall and winter; that the business has been large, and the statement taken from his books is attached. It shows an indebtedness of $43,078.23, subject to credits from Baum & Bro.; also amounts due by the concerns at Dublin and Irwington, all subject to a credit of 521 bales of cotton, which, estimated at $38 per bale, leaves Baum & Bro. indebted to H. M. Comer & Co. $24,661.07. This indebtedness is secured by a mortgage on real and personal property, dated November 13, 1888, by a mortgage on the per-

sonalty, dated November 17, 1888, by certain notes and accounts transferred by the Baums to deponent's firm. This security was given for the sole purpose of securing the debt. He denies that the charges of the bill were true.

Upon the hearing, several creditors were made parties plaintiffs by intervention, among them, H. P. Claflin & Co., New York, whose debt is $11,986.16; A. Gibian, about $1,600; S. Waxelbaum; Culver, Moore & Culver and others. On the hearing plaintiffs put in evidence this statement of Baum & Bro. to their creditors, made December 3d, which is as follows:

STATEMENT.

*Liabilities.*

| | | | | | |
|---|---|---|---|---|---|
| Amount secured claims, | - | - | - | - | $69,625 80 |
| Amount unsecured claims, | | - | - | - | 81,277 64 |
| | | | | | |
| Total liabilities, | - | - | - | - | | $150,903 44 |

*Assets.*

| | | | | | | |
|---|---|---|---|---|---|---|
| Merchandise at Toomsboro, | - | - | - | - | $18,095 36 | |
| Merchandise at Dublin, | - | - | - | - | 17,900 45 | |
| Merchandise at Irwinton, | - | - | - | - | 6,540 00 | |
| Real estate, mules, horses, etc., | | - | - | | 7,165 00 | |
| Total notes and accounts | - | - | $105,150 92 | | | |
| Deduct for worthless and doubtful claims, | - | - | - | 72,310 54 | | |
| | | | | | | |
| Notes and accounts at actual value, | - | - | | $32,840 35 | | |
| Cash on hand, | - | - | - | - | 1,385 00 | |
| | | | | | | |
| Total available assets, | | - | - | | | $83,926 19 |

*Recapitulation.*

| | | | | | | |
|---|---|---|---|---|---|---|
| Total available assets, | - | - | - | - | $83,926 19 | |
| Deduct for secured claims, | | - | - | - | 69,625 80 | |
| | | | | | | |
| Leaving balance, | - | - | - | - | | $14,300 39 |
| Amount of unsecured claims, | | - | - | - | | 81,277 64 |

Also the affidavit of Albert M. Holstein, agent of plaintiffs, which proves the account and demand of the plaintiffs, and states that it was made on the faith of the statement to Bradstreet, made by the defendants. This showed that the defendants were entirely solvent. The statement is as follows:

EXHIBIT A.

[Late Report.]

EXECUTIVE OFFICES, 279, 281, 283, BROADWAY, NEW YORK.

BRADSTREET'S

*No.* 82 *West Third Street,*

CINCINNATI, July 19, 1888.

*The Bradstreet Company.*

Give us in confidence, for our exclusive use and benefit in our business, under our agreement with you, such information as you may have or may be

able to obtain concerning the responsibility, character, reputation, credit, etc., of

Name—N. B. Baum & Bros.

Business—Gen. Store. ⎰ July 20, ⎱
Street and No. ——— ⎰ 1888. ⎱

City (or P. O. Address)—Toomsboro.

County—Wilkinson.

State—Ga.

Signature of M. & L. S. F. & Co., Subscriber.

2402—P. O. Address.

☞ Information will be furnished upon the proper filling up of this blank and the signature of the subscriber.

2–13–8–10m.

### Exhibit B.

Baum, N. B. & Bro., Toomsboro, Ga., Wilkinson county.

A. W. Baum, aged 36 years, and married.

N. B. Baum, aged 39 years, and married.

States: Began business in 1875 in a small way, and have been quite successful. As per inventory taken January 15, 1888, our *status* is as follows: Stock of merchandise, nineteen thousand dols.; bonds and stocks, par value, twenty-one thousand dollars; market value, twelve thousand dollars; notes and accounts, thirty-five thousand dollars; real estate, town property and lands, ten thousand dollars; making total assets of the firm, seventy-six thousand dollars. Liabilities: Borrowed money for the year 1888, twenty-four thousand dollars; mercantile and other indebtedness, twelve thousand dollars; total liabilities, thirty-six thousand dollars. Net: Forty thousand dollars. We have a branch store at Irwinton, Ga. The business there is run under the style of "Baum & Co." Stock on hand there, two thousand dollars; notes and accounts, four thousand dollars; cash, five hundred dollars; total, six thousand five hundred dollars; and owe three thousand dollars. After allowing for shrinkages, bad debts, etc., consider ourselves worth fully thirty thousand dollars, over liabilities. There are no mortgages or liens on any of our property, either real or personal. Our stock is insured for thirteen thousand dollars; fixtures, two thousand dollars. When we borrow money from banks we deposit our bonds and stocks as security. From our cotton factors we borrow on farmers' notes as collateral; give no other security. Do an annual business of seventy-five to eighty-five thousand dollars. In addition to the above we sell 5 or 6 hundred tons of fertilizers per annum, which we buy outright. Give notes for the same, payable in fall. To only one company do we give farmers' notes as collateral. At this point we cleared ten thousand dollars on guano alone.

The Mercantile News Agency states: We learn they carry an average stock of about fifteen thousand dollars, and do a large business, sell largely on credit, and consequently have considerable due them. Said to borrow considerable money to use in their business, and generally put up planters' notes as collateral. They are reputed to own real estate worth five to eight thousand dols. Would be difficult to give correct estimate of their net worth, but it is the general belief that the firm is estimated worth fully twenty thousand dollars, or more. They are of good character, and steady habits, and of fine business ability. Appear to do nearly all the business that is done at this point, and are generally prompt in meeting their obligations, and are quoted in good credit.

*May 21st*, 1888.

[Indorsed:] Bradstreet's. 10–19–1888. To M. & L. S. Fechheimer & Co. The correctness of this report is not guaranteed; but having been obtained by

us in good faith—from authorities deemed reliable—it is transmitted to you in strict confidence for your exclusive use and benefit, and in accordance with the terms of the contract existing between us.   Respectfully,

THE BRADSTREET CO.

*State of Ohio, Hamilton County, ss.:*   Before me personally appeared Levi C. Goodale, who, being duly sworn, says that he is the superintendent of the Bradstreet Co. Mercantile Agency, office at 82 West Third street, Cincinnati, Ohio.   That on July 19, 1888, they received a ticket of inquiry from M. & L. S. Fechheimer & Co., of Cincinnati, Ohio, asking for information concerning the responsibility, character, reputation, credit, etc., of N. B. Baum & Bro., whose post-office address was Toomsboro, Ga.   Said ticket of inquiry is attached hereto, made part hereof, marked "Exhibit A."   That on the 20th day of July, 1888, we made a report in answer to said inquiry, an exact copy of which answer is attached hereto, made part hereof, marked 'Exhibit B.'   We obtained this information in the regular course of our business, and for our company in that section of Georgia in which the business of N. B. Baum & Bro. is located.                    LEVI C. GOODALE.

Sworn to before me, and subscribed in my presence, this 19th day of December, 1888.                         WILLIAM S. LITTLE,
Notary Public, Hamilton county, Ohio.

R. W. Patterson, one of the solicitors for the plaintiffs, testifies that he was present at the meeting of defendants' creditors on December 3, 1888. Baum offered to unsecured creditors $12\frac{1}{2}$ per cent. of their claims in 30 days' time, and $12\frac{1}{2}$ per cent. additional in 12 months, neither secured. Subsequently inquiry was made by Mr. H. M. Comer if the offer would be accepted if he (Comer) would guaranty the first $12\frac{1}{2}$ per cent.   Some of the creditors, and among them the plaintiffs, declined to accept.   C. H. Cohen, attorney for H. P. Claflin, testified that on November 23d he called on the defendants at Toomsboro; that N. B. Baum told him that he had been under contract to Mr. Comer for some time to give the Comers a mortgage whenever they demanded it, and he felt compelled to do as he had previously agreed, which deponent understood was to give the mortgage upon all his assets, including the goods that deponent's clients had but recently sold him.   This witness proves the account of H. P. Claflin & Co. in the sum of $11,986.16.

R. W. Patterson, J. W. Lindsay, and C. H. Cohen testify that they heard H. M. Comer state before the meeting of creditors that he had an agreement with N. B. Baum, of the defendants, to the effect that Baum would execute a mortgage to him upon whatever assets he had, and that on this agreement Comer had made him advances, and that the agreement had been in force for as much as a year prior to that time.   Deponents further say that they heard N. B. Baum, at the creditors' meeting, state that he was insolvent at the time he made his statement to Bradstreet's agency, in May of the present year, although he did not know it at the time.

C. A. Turner testified by affidavit that, after the deputy-marshal had closed the store of the defendants at Toomsboro, he heard N. B. Baum say in a conversation with deponent that he had in his possession the notes, accounts, and assets of Baum & Bro. and Baum & Co., which

had prior to that 'time been turned over to H. M. Comer & Co., of Savannah. The bills for most of the plaintiffs' goods sold to Baum were dated on August 6th, August 10th, August 13th, and a renewal note was taken on October 9, 1888. It was shown by the evidence that this was the manner in which the goods were sold: The traveling agent of the plaintiff took the order in July, subject to ratification by the house, on inquiry as to solvency. This inquiry was made to Bradstreet. The goods were not shipped unless the reply was satisfactory. The sales were not completed until the goods were sent.

For the defendants the following evidence was submitted: The agreement entered into between N. B. Baum & Bro. and Baum & Co. and H. M. Comer & Co., dated March 10, 1888. It recites that for and in consideration of certain advances to the amount of $18,000, as evidenced by five promissory notes for $3,200 each, signed by N. B. Baum & Bro., and indorsed by Baum & Co., and payable at the office of Comer & Co., as follows, respectively, on September 15th, October 1st, November 1st, and November 10th; and one note for $2,000, signed by Baum & Co., and indorsed by Baum & Bro., due October 20th next.

"Now, in order to secure these and any other sum that may hereafter be due them, we agree to deposit with them as collateral security, notes and mortgages of good planters' and others to whom we sell goods, in amount equal to at least two dollars for every one dollar due by us to the said Comer & Co. We also agree to transfer to them as additional security our insurance policies on our buildings and stocks of goods; and we further obligate and bind ourselves to give said H. M. Comer & Co. a first lien or mortgage upon all our stocks of goods and real estate, in case we shall at any time become financially embarrassed while indebted in any way to them, or in case our said notes above described are not paid promptly at maturity. It is also understood and agreed that all drafts drawn, or money advanced upon account or otherwise, over and above the eighteen thousand dollars herein named, shall be paid out of the proceeds of cotton shipments first and before said proceeds are to be applied to said notes; in other words, only credit balances as may appear from open account are to be paid on said note unless by consent of said H. M. Comer & Co. in writing. It is understood and agreed that 8 per cent. per annum will be charged on all advances, etc. [Signed] N. B. Baum & Bro., and "N. B. Baum & Co."

The mortgage dated the 17th day of November, to secure the payment of $38,000, including the five notes before mentioned and three other notes for $5,000 each, dated October 12, 1888, and due at various dates until December 10, 1888, and one note for $5,000, due January 12, 1889, and one note dated March 10, 1888, for $2,000, signed by Baum & Co., indorsed by Baum & Bro., payable October 20, 1888, upon 150 half rolls of bagging, 100 bundles cotton ties, 100 sakes salt, all in the planters' warehouse at Dublin; and also all goods, merchandise, dry goods, groceries, etc., stored in the store of L. C. Perry & Co., at Dublin, Ga.; also, a mortgage made 13th of November, 1888, to secure $30,000, being apparently the same notes just mentioned, and given upon certain lots of land situated in Toomsboro, and upon which is erected storehouses; and also certain stocks of general merchandise in said store, de-

scribing them particularly; and also all such articles and things as may be hereafter placed in such stocks; also the stock in the store at Dublin, more particularly describing it, with the same provision as to future acquisitions; also a lot of land, one-half acre in Irwington, with store-house thereon, and also the stock of goods therein contained. The mortgages comprehend all the safes, show-cases, and fixtures of every kind in said three stores. Numerous affidavits were presented as to the policy or impolicy of granting the prayer of the bill for the appointment of a receiver, and an affidavit to sustain the good character of H. M. Comer,—in the opinion of the court a deposition altogether superfluous. Other portions of the testimony are not material or necessary to the proper determination of the cause. After a full hearing and exhaustive argument on Friday last the court took time to consider, and has reached the following conclusions:

*Patterson & Hodges,* for plaintiffs.

*Hill & Harris* and *Denmark & Adams,* for defendants.

SPEER, J., (*after stating the facts as above.*) Baum & Bro. and Baum & Co., two firms composed of the same individuals, are traders, in the meaning of the statute of this state quoted above. That they are insolvent it is conceded. The plaintiffs are creditors, whose demands, as the court is at present advised, are within the class provided for in the statute above quoted, (Code Ga. § 3149*a,*) giving, in certain cases, the equitable right to the extraordinary remedies applied for. This right of the creditor to put the debtor's assets, when the latter is an insolvent trader, in the hands of a receiver, is peculiar to the law of this state. It has no existence in the general jurisprudence of equity which obtain in these courts. It is now settled, however, that the courts of the United States may administer an equitable right granted by the law of the state in suits of which, from other reasons, they have jurisdiction. It was urged in argument for the defendant that the creditors, without a judgment at law, have no right to apply in equity for the appointment of a receiver. That this is a general rule is undeniable, but there are exceptions to it, and one of these exceptions of apparently clear distinctness is where the law-making power has enacted in terms that the debt need only be mature, with payment demanded and refused, as is the law in Georgia. It is true, also,—as held in this circuit, in *Jaffrey* v. *Brown,* 29 Fed. Rep. 477,—that a party not intending to pay, by inducing one to sell him goods on credit through the fraudulent concealment of his insolvency and of his intent not to pay for them, is guilty of a fraud, which entitles the vendor, if no innocent third party has acquired an interest in them, to disaffirm the contract, and recover the goods. See, also, *Crittenden* v. *Coleman,* 70 Ga. 295; *Donaldson* v. *Farwell,* 93 U. S. 633; note to *Jaffrey* v. *Brown,* 29 Fed. Rep. 485, and authorities cited. The remedy at law must be quite as complete as that in equity to defeat the power of equity to proceed. *Id.*

The demurrer filed to the bill, while not finally overruled, is not deemed sufficient, as the court is at present advised, to defeat the relief

sought by the bill, should that relief be granted.   The chancellor has given very anxious thought and careful inquiry to the ascertainment of his duty in the premises.   It is true that the prayers of the bill seek to obtain perhaps the most vigorous and far-reaching action in the power of the court—action which should not be taken in cases of this character, except in the presence of plain fraud or irreparable injury.   On the other hand, the statements of the defendants themselves show the most utter insolvency, and a failure to comply with their duty to their creditors, which evinces either negligence of the most flagrant character, or fraud scarcely less marked and decided.   Upon the 21st of May, whatever may have been the motive which led to the publication, it is undeniable that the defendants gave to the mercantile community, by means of a usual and widely known commercial news agency, a statement which shows remarkable solvency, and indeed prosperity, for their section of the country.   "Our total assets," they said, "are seventy-six thousand dollars; our liabilities, thirty-six thousand dollars, net.   After allowing for shrinkages, bad debts, and so forth, we consider ourselves worth fully thirty thousand dollars over liabilities, etc.   There are no mortgages or liens on our property, either real or personal.   Our stock is insured for thirteen thousand dollars.   When we borrow money from bank we deposit our bonds and stocks as security.   When we borrow money from our factors we give farmers' notes as collateral; give no other security."   In a little more than six months we find this firm in debt $150,-903.44, with total assets of $83,926.19, leaving debts to the amount $66,976.25, altogether hopeless.   In other words, in a half year there had been a change for the worse in their condition of nearly $100,000,—if their respective statements to Bradstreet's and to their creditors is reliable.   For this startling transformation of their condition they offer neither explanation nor excuse.   There had been no disaster from flood or fire, no epidemic, none of those extraordinary circumstances which at times cause the stoutest business houses to tremble.   In May there is an indebtedness of thirty-six thousand, in December a debt of one hundred and fifty thousand.   In May there are neither liens nor mortgages, in December they approximate seventy thousand dollars.   In the spring creditors were assured of prompt payment, in the fall they are met by hopeless insolvency; and yet the court is asked to consider this an innocent and unavoidable failure, and this, too, in the absence of a syllable of proof to account for it.   What makes it more remarkable is that the business was conducted in quiet villages, and among a rural population, where all legitimate trade was marked by careful purchases and conservative transactions; where every purchaser is personally known to the merchant,—his solvency and disposition or ability to pay debts as familiar as household words.   But this is not all.   In the proclamation of Baum & Bro. to the business community of the country, they say "there are no mortgages or liens upon our property."   At that moment it was all incumbered with a secret obligation which a court of equity in a proper case would declare to have all the effect of a mortgage.   In less than six months every cent's worth of their stock or other assets, whether paid

for or not, is shingled with mortgages, made in pursuance of that covert stipulation. In the presence of such facts as these it would seem futile to urge upon the court the considerations of business capacity and business integrity and mercantile popularity, which form so large a part of the defendants' showing. "We give to our factors no security save farmers' notes." As that public pledge was being made their contract was in existence, not only to give two dollars for one, in notes and choses in action, for every dollar obtained from their factors, but to give mortgages which are undeniably other and very different security. "Our stock is insured for $13,000," said they to Bradstreet's,—they did not say the policies had been pledged to H. M. Comer & Co., and out of the reach of other creditors.

It would seem superfluous to analyze the widely variant statements of the defendants, and it requires no elaborate inquiry to ascertain the law controlling the rights of the parties with such facts before the court. The statutes of the state are sufficiently explicit. Suppression of a fact material to be known, and which the party is under an obligation to communicate, constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties, or the peculiar circumstances of the case. Code Ga. § 3175. Can it be doubted that the fact that the defendants were under a written obligation to execute mortgages upon their entire stock and all their other property, was "material to be known" by those giving them credit? Can it be doubted that when the Baums undertook to give to Bradstreet's, for the information of the business world, a statement of their assets, liabilities, and methods of borrowing money, that the obligation was upon them to communicate the truth? Will the most credulous believe for a moment that Fechheimer & Co. would have given them credit for $4,000; that Claflin & Co. would have given them credit for $11,000,—had they known the existence and the nature of their obligation to Comer? We think not. The statements of such mercantile agencies as Bradstreet's are intended to influence the action of merchants and others who give credit. It is well understood that the mercantile community relies largely upon such statements, and the persons giving them are under the weightiest obligation, which will be enforced *in foro conscientiæ*, to speak the truth. If there has been deliberate suppression of a vital fact in a statement of this character, which does mislead, it is a fraud upon the person misled, which a court of equity will redress, if possible. Again, "misrepresentation of a material fact, made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or, if made by mistake, and innocently, and acted on by the opposite party, constitutes legal fraud." Code Ga. § 3174. See, also, section 2634.

Now, it appears from the evidence of Messrs. Patterson, Lindsay, and Cohen that N. B. Baum admitted in their presence and hearing that he was insolvent at the time the statement to Bradstreet was made, although he there asserted a net worth, above all liabilities and doubtful assets, of fully $30,000, but that he did not then know his insolvent condition. Conceding, therefore, that this statement was honest, it is none

the less fraudulent in contemplation of these provisions of the Code. It follows that, even in the absence of the insolvent traders' act, before quoted, the plaintiffs would be entitled to the relief they seek if it can be made to appear that there is a prospect of redressing their wrongs thereby. Much more, then, are they so entitled under the provisions of that act. It is said, however, for the defendants, that the liens created by Baum & Bro. to Comer and others will exhaust the assets, and that the unsecured creditors can get nothing through the action of a receiver, however vigilant he may be. But the defendants themselves admit that the assets amount to about $86,000 more than the preferences he has given. It is true that he states that $72,310.54 of notes and accounts are worthless and doubtful, but the court is not inclined to accept this statement as final. It would be very remarkable if his doubtful debts in December should be as much as his total assets in May. A diligent receiver will collect many of those claims, or the court will know the reason why. Besides, by the same statement there is a balance of $14,300.39 to be divided among the unsecured creditors. This is itself no mere bagatelle. We have known original suits to be brought for less. But perhaps more important than either of these is the fact that Comer & Co., who only claim $24,671.07 as the sum of their demands against the Baums, have now in their possession $50,000 worth of good notes and accounts, and mortgages on $49,000 worth of property consisting of merchandise and other personalty and certain realty. However valid may be the demand of Comer & Co., when it is paid they will not be permitted to retain a dollar in excess of their proven claims. It is true that by the law of Georgia, section 1953, "a debtor may prefer one creditor to another, and to that end he may *bona fide* give a lien by mortgage or other legal means, or he may sell in payment of the debt, or he may transfer negotiable papers as collateral security, the surplus in such cases not to be reserved for his own benefit or that of any other favored creditor, to the exclusion of other creditors." The large surplus conveyed to Comer & Co. to secure their debt they hold as trustees for the creditors of the defendants, the Baums. Besides, the balance which Comer & Co. present is ascertained by estimating more than 500 bales of cotton shipped to them at $38 a bale. They have turned over notes and accounts of the insolvent firm to one of its members for collection. This will not be permitted. The insolvent debtor who has failed under such circumstances is not the best custodian for convertible assets of this character.

This investigation has satisfied the court that this is a suit where it is manifestly the duty of the chancellor to make the orders prayed for. A receiver will be appointed, and an injunction granted. Comer & Co., who are now formally made parties defendant to the bill, will be required to make proof of their account, and if found just and true and a valid lien, as it now appears to be, it will be paid in full if the funds are sufficient. This is true of other debts of superior dignity, and the remainder of the fund in the hands of Comer & Co. and elsewhere within the reach of the court will be apportioned to the creditors. The court will appoint receivers of undoubted qualifications, who will at once take possession of

the assets of the insolvent firm, and as fast as collected pay the funds into the registry of the court, and the cause will proceed with the utmost expedition