## In re EPSTEIN.

(District Court, W. D. Arkansas, E. D. June 4, 1901.)

1. BANKRUPTCY—FALSE STATEMENTS BY BANKRUPT—RIGHT OF CREDITOR TO RECOVER GOODS SOLD.

Where a bankrupt knowingly made false statements of his assets or liabilities in reports made to commercial agencies, a wholesale dealer, who sold him goods on credit in reliance on such reports, is entitled to rescind the sale and recover the goods, without regard to whether or not the

statements were made with fraudulent intent; but it is essential to such right of rescission that the credit should have been induced by the false statements, and, but for them, would not have been extended.

**2. SAME.**

A merchant made false statements as to the amount of his indebtedness in reports sent to commercial agencies, but without fraudulent intent, and with the belief and expectation that he could pay for all goods purchased. In reliance on such reports, a wholesale house accepted orders for goods to be shipped on credit. Before all the goods had been shipped, the debtor became in default on payments due for prior shipments, and the creditor sent its agent to insist on payment, and to arrange for prompt payment in the future before further shipments were made. The agent made no inquiry as to the debtor's financial condition, and the creditor refused the debtor's request for a reduction of his orders, and shipped the remainder of the goods on receiving further payments. *Held,* that it was put upon inquiry, and was chargeable with notice of the facts which could have been learned by its agent, and that on the subsequent bankruptcy of the debtor it could not rescind the sale and recover the goods thereafter shipped, as having been obtained through fraud.

In Bankruptcy. On intervention of the Strobel & Wilkin Company.

The intervener filed its petition to recover certain merchandise of the bankrupt estate now in the possession of the trustee in bankruptcy, claiming that the same were fraudulently obtained by the bankrupt with the intention of not paying for them, and also upon false representations as to his financial condition. The trustee denied the allegations in the petition, and the entire matter was referred to the referee in bankruptcy as special master, with directions to take proofs, make special findings of all the facts, and also report his conclusions of law. The special master made full findings of the facts, and his conclusions of law are that the intervener, upon the facts found, is not entitled to recover the goods claimed by it. Numerous exceptions were filed by the intervener to the findings of facts, as well as the conclusions of law, of the special master, which, having been overruled by the special master, were renewed in court after the filing of the report.

W. E. Atkinson, for intervener.

Morris M. Cohn, John M. Moore, and W. B. Smith, for trustee.

TRIEBER, District Judge. Among the findings made by the special master is the following:

"I find that on February 15, 1900, at the request of the Crockery Board of Trade of New York City, Epstein made a report of his business and financial condition in which he stated:

| | | |
|---|---|---|
| Cash valuation of merchandise on hand as inventoried on the 12th day of February, 1900, to be | $19,200 | 00 |
| Notes and outstanding accounts collectible of the value of | 5,500 | 00 |
| Cash in bank | 685 | 00 |
| Store fixtures, etc., actual valuation | 1,500 | 00 |
| Total assets in business | $26,885 | 00 |
| He owed at that time, on merchandise | $ 913 80 | |
| Owed bank | 4,000 00 | 4,913 80 |
| Leaving net worth of business | $21,971 | 20 |

—And that he had real estate unincumbered at that time of the value of $4,000. That he owed no debts, except as therein mentioned, and stock was insured for $17,000; fixtures $1,200; real estate for $1,300. His sales for the past year were $40,000. His expenses for the past year were $7,500. No merchandise creditors were secured, no judgments against him, no chattel mortgages or other recorded liens against his property. On the 17th day

of February he made practically the same report to the Bradstreet Commercial Agency. These reports were delivered to the intervener before the goods claimed by the intervener were shipped. The Bradstreet Company consulted independent sources of information regarding Epstein's financial condition and standing, and did not rely alone on his statement to it, which, after making allowance for exemptions and shrinkage, placed the net worth of his business at $15,000. It also gave its estimate of Epstein's honesty, industry, and ability. Also its opinion of his safety for legitimate business requirements. Epstein omitted from these reports $4,500, which he now admits he owed his father, and also $1,000, which he owed his two wards. I find that these statements were made with no intent to procure a false or fictitious credit; that the omission of the two items of indebtedness were because Epstein did not regard them as indebtedness of the business, and not with the intent of deceiving the persons from whom he intended to purchase goods. Epstein believed his business affairs to be in a sound condition, and that he could pay for the goods in the usual course of business, as he had formerly done. Epstein's reports to the Crockery Board of Trade and to Bradstreet made in 1899 and in 1898 omitted the items he owed his father and to his wards, and the reports of 1900 do not differ from them in this respect. I do not find that this report had any controlling influence in inducing the credit extended to Epstein by the intervener."

It is claimed on behalf of the trustee, and was so determined by the special master, that the omission of the bankrupt to include in his statements made to Bradstreet's Commercial Agency and the Crockery Board of Trade the items of $4,500 due to his father and of $1,000 to his children, whose guardian he was, not having been made with a fraudulent intent to procure a false and fictitious credit, but in good faith, because he did not consider these items as debts of the business, intervener is not entitled to a rescission and a return of the goods. Had the intervener relied solely on the fact that these goods were obtained by the bankrupt with the fraudulent intent not to pay for them, perhaps this contention would be correct; but, as a rescission is also asked upon the ground that the goods were obtained upon the misrepresentations of the bankrupt, who concealed the fact that at the time he was indebted to his father and children in the sum of $5,500, the question to be determined is whether such misrepresentations, although not made in bad faith, nor with a fraudulent intent, are sufficient to entitle the vendor, who acted promptly upon the discovery of the true facts, to a rescission. There is no pretense that the bankrupt did not know of this indebtedness at the time, nor is it contended that the amount of these debts was not very material, in view of the real assets of the bankrupt. In such case the intent is immaterial. If a buyer knowingly makes false representations concerning material facts, and thus induces the seller to part with his goods, the seller may elect to avoid the sale, and this without regard to whether the buyer intended to pay for the goods or not. The fraud in such case consists in inducing the vendor to part with his goods by false statements to the buyer known to be false when made, or made by him when he has no reasonable ground to believe that they are not true. When the bankrupt made his statements to the commercial agencies, he knew that they were intended to be furnished to the wholesale trade for the purpose of determining a basis of credit for him. Intervener, before filling the orders of the bankrupt, obtained copies of these statements, and, no doubt, in

reliance upon the truth of these statements, the goods were sold and delivered. That a sale induced by such false representations may be rescinded, although the purchaser made them with no fraudulent intent, is well settled. Turner v. Ward, 154 U. S. 618, 14 Sup. Ct. 1179, 23 L. Ed. 391; Bugg v. Shoe Co., 64 Ark. 12, 40 S. W. 134; Johnson Co. v. Triplett, 66 Ark. 233, 50 S. W. 455; Judd v. Weber, 55 Conn. 267, 11 Atl. 40; In re Gany (D. C.) 103 Fed. 930; Collins v. Cooley (N. J. Ch.) 14 Atl. 574. The law requires not only the utmost good faith between the parties, but a full disclosure of the financial standing of the party desiring to obtain credit, so as to enable the other party to determine his financial ability to pay for the goods when the account matures. The crucial test is, "Would intervener have extended this credit to the bankrupt if advised that his liabilities were $5,500 greater than stated in his report?" If not, and the goods were sold and delivered by reason of these false representations, the right to rescind exists. The exceptions to this part of the special master's report and his conclusion of law must be sustained.

The special master also made the following finding of facts:

"I find that before the goods now claimed by intervener were shipped it had notice of Epstein's inability to pay his debts promptly. Their agent, Sackman, came to Little Rock, and after a report from him, and a correspondence with Epstein about his business, the goods were shipped, and not by reason of the statements to the Crockery Board of Trade and to Bradstreet's Commercial Agency. I find from the testimony submitted to me upon the whole case that the statements made by E. Epstein, the bankrupt, to the Crockery Board of Trade and to the Bradstreet Commercial Agency did not enter into the sale of the goods in controversy in this intervention; that they shipped under circumstances which put the intervener upon inquiry; that it did make all the inquiry which it wished to make without considering the statements; that in August, 1900, it intended to cancel all further shipments of goods to Epstein unless he then satisfactorily arranged for payments which had then fallen in arrears, and that they would not consent to delay or reduce the amount of goods ordered by Epstein when he suggested that he desired to do this. That Epstein sent to intervener large remittances during the summer, and paid large freight bills on goods prematurely shipped by intervener. There is no evidence to justify a finding that he purchased the goods with an intent not to pay for them."

The evidence is sufficient to sustain these findings, although, even if the evidence had not been as strong as it is, as long as there is substantial evidence to sustain the master's findings of facts, the court would not be inclined to disturb them. From the voluminous correspondence between the parties it appears conclusively that the bankrupt did not know, at the time he made these purchases, that they amounted to as much as they did. Not until some time in June and July did he ascertain the amounts purchased by him from the intervener. When he ascertained these facts, he seemed to be anxious to reduce his orders. When advised, in July, of the destruction by fire of a lot of the imported goods, and asked whether he wanted them reordered, he declined to do so. When the bills matured, in July, the bankrupt was unable to pay them, and intervener's drafts on him for these bills were returned unpaid. Intervener, becoming alarmed, directed its salesman to call on the bankrupt, insist on prompt payments, and

inform the bankrupt that the intervener did not want to extend so large a credit to him unless the bills would be paid promptly as they matured, in 30 days after shipment. In this letter to the salesman, it used the following language:

"We cannot ship him any more until we receive a substantial remittance reducing the account considerably. Now, there are no less than 65 cases of imported goods here in the warehouse at this moment. How are we ever to be in a position to ship them to him on time unless he pays up in entirely different shape? Please have a plain, straight talk with him, and let the matter of settlements be very distinctly understood."

This salesman called on the bankrupt, but made no inquiries as to his financial standing. No effort was made to ascertain from the bankrupt his liabilities. Had he inquired of him then how much he owed altogether, and perhaps demanded an inspection of his books, he might have learned of the indebtedness of $5,500. The bankrupt was anxious to have his orders reduced, for in reply to a letter from intervener of date of August 31st, urging prompter payments, and making new propositions as to the goods not yet shipped, and which are nearly all the goods in litigation in this case, he expressed the wish that "his orders could be reduced somewhat," which was declined by intervener. In view of these facts, the court agrees with the special master that the intervener shipped these goods in September, not in reliance upon the statements made by the bankrupt to the commercial agencies in February preceding, but in total disregard of them, influenced, no doubt, by the remittances made by the bankrupt, and his willingness to cancel the unfilled orders. In re Gany (D. C.) 103 Fed. 930, relied upon by counsel for the intervener, where it was held that the mere fact that the vendor required the payment of an overdue bill is not inconsistent with the reliance upon the representations which were false, is not applicable to this case, for there the payment and the false representations were made before the goods were sold, while in the case at bar intervener had, before the goods were shipped, knowledge of facts which put him upon inquiry, and is therefore chargeable with knowledge of all facts which, by the exercise of reasonable diligence, it could have ascertained. The fact that the bankrupt was anxious to have his unfilled orders canceled rebuts any presumption of fraud on his part. The conclusion of the special master that intervener is not entitled to recover is approved, but with no costs to either party for exceptions sustained or overruled; the master's fee and the costs of the proofs to be taxed against the intervener.