DAVIS v. LOUISVILLE TRUST CO. et al.

(Circuit Court of Appeals, Sixth Circuit.   July 13, 1910.)

No. 1,863.

1. EVIDENCE (§ 244*)—RECORDS OF COMMERCIAL AGENCY—REPORT MADE BY PERSON SINCE DECEASED.

A report as to the assets and business of a corporation and the statements of its president made to Dun & Co. by their authorized representative in the regular course of his duty, and placed on file to be furnished to any subscriber inquiring in the due course of the business of the company as a commercial agency, after the death of the representative who made it, is admissible as prima facie evidence that the statements therein purporting to have been made by the president of the corporation were so made by him.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 916–936; Dec. Dig. § 244.*]

2. FRAUD (§ 21*)—CORPORATIONS (§ 80*)—FRAUDULENT REPRESENTATIONS—PERSON ENTITLED TO RELY ON REPRESENTATIONS—STATEMENTS MADE TO MERCANTILE AGENCY.

Claimant, who was negotiating with the president of the bankrupt corporation for the purchase of treasury stock of the corporation, solicited a friend from whom he expected to borrow a portion of the money to pay for the stock to obtain information in regard to the corporation. The friend secured from Dun & Co., a copy from their records of a report made by their representative for their use generally from statements given him by the president, showing the capital paid up, the property and business of the corporation, and that it had no indebtedness, and, in reliance on such report, claimant purchased and paid for the stock at its par value. The statements contained in such report were materially false. Held, that the report must be considered as addressed to any person to whom it should be furnished by the mercantile agency in the regular course of its business, or to whom it might rightfully be communicated either as a basis for credit or for investment in the stock of the corporation, which it was endeavoring to sell at the time the report was made; that the statements therein constituted false and fraudulent representations, which entitled claimant to rescind the contract of purchase, unless barred by laches or acquiescence.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 9, 10, 23; Dec. Dig. § 21;* Corporations, Cent. Dig. §§ 244–265; Dec. Dig. § 80.*]

3. CONTRACTS (§ 270*)—RESCISSION—LACHES—APPLICATION OF DOCTRINE.

The defense of laches to defeat the right to rescind a contract for fraud will not be entertained unless it is made to appear that it would be inequitable to deny it.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1189, 1200; Dec. Dig. § 270.*]

4. CONTRACTS (§ 270*)—RESCISSION FOR FRAUD—LACHES.

A claimant who was induced by fraudulent representations to purchase stock in a corporation, and who sought to rescind prior to the bankruptcy of the corporation, held not barred by laches, and entitled to prove his claim in bankruptcy for the purchase price of the stock.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 270.*]

5. BANKRUPTCY (§ 345*)—PROCEEDINGS ON OBJECTIONS TO CLAIM—ISSUES.

A court of bankruptcy in adjudicating upon the claim of a creditor is without authority to adjudge such claim priority over the claims of certain other creditors on grounds which would ordinarily be the basis for an action of deceit, where, although such other creditors appeared, no

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

such issues were formulated and presented against them either severally or jointly.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 345.*]

Appeal from the District Court of the United States for the Western District of Kentucky.

In the matter of the Howe Manufacturing Company, bankrupt. On appeal from order disallowing claim of Hueling Davis. Reversed.

This is an appeal from an order entered in the court below April 9, 1908, rejecting a claim of Davis, appellant, against the Howe Manufacturing Company, bankrupt, for $5,000 and interest. The company was adjudicated a bankrupt December 22, 1906, and the Louisville Trust Company, one of the appellees, was thereafter appointed trustee. The claim grows out of a purchase by Davis of 50 shares of the par value of $100 each of the capital stock of the bankrupt. In his original and amended proofs of claim Davis alleges that he subscribed for the stock and paid its par value in cash to the company in reliance upon the truth of certain representations made by the company through its president and vice president, who were also directors; that these representations were false and fraudulent and made for the purpose of inducing him to purchase the stock; that upon discovery of the fraud he repudiated and rescinded the contract, tendered to the company the certificates representing the stock, and demanded payment of the price with interest, which was refused.

The alleged false representations consist of two classes. The first class is said to be comprised in a report made by Ben Howe as president of the company to R. G. Dun & Co., a mercantile agency, then maintaining an office in Louisville. The other class is claimed to have been made principally, if not wholly, by T. L. Jefferson as vice president and director of the company through a letter written to a Mr. Chess and through statements made by Jefferson both to Chess and Davis. A copy of the report to Dun & Co., as well as the letter written by Jefferson to Chess, were placed in the hands of Davis before he purchased. These representations related to the financial condition of the bankrupt company and also of another company bearing the same name, the assets and good will of which had been purchased and taken over by the new company. It is not necessary to set out more than the substance of the statements said to have been made, or the evidence offered in support and denial of the contentions made by the respective parties.

In addition to what will be found in the opinion, it is sufficient to state that the present controversy began with negotiations had in July, 1903, between Davis and Howe, whereby Davis was to take stock and Howe was to give him employment in the company, and that Davis thereupon borrowed of Chess $2,500 and of Llewellyn Smith the same sum, giving to them his notes and using the money in buying the stock. Davis was given employment in the company and continued therein in several capacities for a period of nearly three years, and received from the company compensation of about $3,000, when, at the close of April, 1906, he claims to have made discoveries which caused him to quit the employ of the company. He testified that he suspected financial difficulty in the affairs of the company in March of that year through knowledge he obtained of a proposed contract—called a "four-cornered agreement"—to which the company, a "syndicate," the Western National Bank, and Jefferson were to be parties, designed in some way to aid Jefferson if not the company itself. This resulted in an investigation and the discovery claimed to have been made by Davis upon which he bases his contention that he was entitled to rescind. He insists further that his right extends not only to proving a general claim for $5,000, but also to priority over certain of the creditors, if not all of them, in the assets of the bankrupt. The particular creditors against whom the claim of priority is made are Jefferson, the Western National Bank of Louisville, and Ben Howe, both individually and as assignee of certain claims of creditors of the bankrupt. The claims of Davis in both the respects last mentioned were allowed by the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

referee, but the orders in that behalf were reversed and set aside by the court below.

Helm Bruce and Percy Booth, for appellant.
Johnson & Hieatt, for appellee Louisville Trust Co.
Henry Burnett, for appellee Jefferson.
Bernard Flexner, for appellee Western Nat. Bank.
Henry Burnett and Bernard Flexner, for appellee Howe.

Before SEVERENS, WARRINGTON, and KNAPPEN, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above). The initial test of the validity of the claim of Davis is involved in important questions of admissibility of evidence. It is contended in the first place that no competent witness was produced to testify that any report of the financial condition of the company was ever made to the mercantile agency; and, in the next place, that the instrument exhibited as such a report could not if received in evidence be considered as addressed to Davis or as having been intended to influence him or any one else in the purchase of treasury stock of the bankrupt company. The court below regarded the report as inadmissible, and so declined to consider it. This is made the subject of the first assignment of error.

The paper was received in evidence by the referee. It was admittedly a copy of what purported to be a report made by J. H. Saunders as city reporter of Dun & Co. at Louisville. It was shown that he had occupied that position for 10 years, but that he was deceased at the time the report was offered in evidence, and that he had made and presented the writing on June 18, 1903, to the superintendent of Dun & Co. The material parts of the report are: An abstract of a portion of the articles of incorporation of the bankrupt company dated June 1, 1903, showing its authorized capital stock, $500,000, its successorship to the business of the old company and names of the subscribers for 2,430 shares of $100 each of the new capital stock and specifying the number taken by each subscriber. It then proceeds:

"Ben Howe, the president, states there has been actually paid in cash $250,000, that the assets consist of machinery, merchandise, etc., and that the new company has no indebtedness. He further states that the company has purchased a wholesale plumbing and steam fitting supply business, for which they paid $150,000, and that they have also purchased another business for a like amount at Birmingham, Ala., and, while all deals have been completed, they are not ready to make a detailed statement of the company's affairs. It is their intention to elect three more directors. Claims that the entire capital of $500,000 will be paid up within the next two weeks. * * * It will be seen that they have not completed their affairs and just what amount of actual capital they have cannot be ascertained."

J. J. Saunders testified that he was then manager of the mercantile agency at Louisville, and at the time the report was made he was assistant manager. He further testified that the paper offered in evidence was a "copy of the report from our records," production of the original having been waived, and, referring to what he called the "record" of the report in question, he further said that his deceased brother was the author of the report; that the records show that his brother

had received the statement contained in the report and had made it a matter of record; that "it was kept in our regular files to be given to anybody that wanted information of that company (the Howe Mfg. Co.) at that time"; and that such statements "are placed on record for the purpose of giving them to inquirers." He was, however, not present when Howe purports to have made statements to the deceased brother, but it was agreed that J. J. Saunders would if recalled testify:

"His knowledge of such alleged statements was and is based on his knowledge of the record on file in the office of R. G. Dun & Co., and on his knowledge of the making, filing, and preserving of said record, and on his knowledge of the business of R. G. Dun & Co., and the methods, rules, customs, and circumstances governing the statements made to R. G. Dun & Co., and governing the making, filing, and preserving of other records of such statements."

He delivered to Chess a copy of the report on August 4, 1903.

The objection urged against receiving this report is that it is hearsay. We think the right to resort to secondary proof in the circumstances stated is reasonably well settled. The principle underlying the admissibility of such evidence is that the person making the report was engaged in the regular course of a distinct business, before any dispute arose, and in the discharge of a duty to record matters for others, without having any personal interest in the subject recorded.

It is well settled in what we regard as kindred cases that the duty thus discharged need not be imposed by law. It is enough that the duty is recognized. The fact that the record is designed for the use of all persons rightly interested in the subject, and that the success of the business of supplying the information so obtained is dependent upon its accuracy, cannot, we think, but enhance the obligation and sense of duty involved. When it is shown that a record was made in that way and with the motive indicated, that it has been carefully preserved, and that the author is dead, there can be no perceivable violation of any principle of evidence by treating the report as prima facie evidence that the acts and matters so recorded and purporting to relate directly to the business in hand occurred as there stated, subject of course to contradiction by other evidence.

In Nicholls v. Webb, 8 Wheat. 326, 337, 5 L. Ed. 628, when passing upon the admissibility of memoranda of a deceased notary, made in the regular course of his business, but not in obedience to law, Justice Story said:

"We think it a safe principle that memoranda made by a person in the ordinary course of his business of acts or matters which his duty in such business requires him to do for others, in case of his death, are admissible evidence of the acts and matters so done. It is, of course, liable to be impugned by other evidence; and to be encountered by any presumptions or facts which diminish its credibility or certainty."

The contention of counsel for appellees that that decision has been repudiated by the Supreme Court is not tenable. This will be seen by comparison of the last case relied on by counsel—Bates v. Preble, 151 U. S. 149, 14 Sup. Ct. 227, 38 L. Ed. 106—with another case decided by the same justice later. We refer to Constable v. National Steamship Co., 154 U. S. 51, 14 Sup. Ct. 1062, 38 L. Ed. 903. In

passing upon the admissibility of a memorandum made in pursuance of a practice and usage in the port of New York touching the posting of notices in the custom house of the time of unloading vessels, the learned justice said (69):

"The practice even of a private office. if well established is presumed to have been followed in individual cases and is accepted as sufficient proof of the fact in question when primary evidence of such fact is wanting"—[citing among other cases, Nicholls v. Webb].

The authority of Nicholls v. Webb was recognized, also, by Mr. Justice White in Putnam v. United States, 162 U. S. 687, 695, 16 Sup. Ct. 923, 40 L. Ed. 1118. In Kennedy v. Doyle, 10 Allen (Mass.) 161, 167, Judge Gray said:

"In the United States the law is well settled that an entry made by a person in the ordinary course of his business or vocation, with no interest to misrepresent, before any controversy or question has arisen, and in a book produced from the proper custody, is competent evidence, after his death, of the facts so recorded."

See, also, Lassone v. Boston & Lowell R. Co., 66 N. H. 345, 24 Atl. 902, including note to the case found in 17 L. R. A. 525, stating, "Careful research has failed to find any direct authority not cited in the report of the case;" Leland v. Cameron, 31 N. Y. 115, 120; Augusta v. Windsor, 19 Me. 317; Abel v. Fitch, 20 Conn. 90, approved in Town of Bridgewater v. Town of Roxbury, 54 Conn. 213, 6 Atl. 415; 1 Smith's Leading Cases, in note to Price v. Earl of Torrington, p. 571; 2 Wigmore on Evidence, §§ 1517–1522.

Treating the report of the mercantile agency then as prima facie evidence of the fact that the president of the bankrupt company made the representations therein stated, the question arises: To whom were they addressed? Was Davis entitled to rely upon them? This question is not of easy solution. Davis was not a patron or subscriber of R. G. Dun & Co. He obtained the report through Chess, and Chess obtained it from Dun & Co. through his membership of the Chess-Wymond Co., which seems to have been a patron of R. G. Dun & Co. It is clear enough that, if Chess had obtained the report for either his firm or himself for the purpose of determining whether to give credit in the way of sales of material or loans of money, he might rightfully have placed faith in the report; for ordinarily such statements are given for the very object of fixing a basis of credit. As stated in National Bank of Merrill v. Illinois & Wisconsin Lumber Co., 101 Wis. 247, 253, 77 N. W. 185, 188:

"The commercial agency which gathers and circulates reports as to the financial standing of business houses is an institution now so well established, and its reports are so universally used, that no court or merchant can plead ignorance of its purpose or functions. When a merchant states to such an agency his financial condition, he knows it is for publication to the business world, and that such publication will probably be consulted when he applies to any business institution for credit. He makes his statement, therefore, knowing that it will probably be used as a basis of credit. Upon what ground can it be said that such a statement is not a representation made for the purpose of securing credit as fully as if made personally to each business house with which he has dealings."

See, also, Genessee Sav. Bank v. Mich. Barge Co., 52 Mich. 164, 170, 438, 17 N. W. 790, 18 N. W. 206; Stevens v. Ludlum, 46 Minn. 160, 161, 48 N. W. 771, 13 L. R. A. 270, 24 Am. St. Rep. 210; Eaton, Cole & Burnham Co. v. Avery, 83 N. Y. 31, 34, 38 Am. Rep. 389, limited in Macullar v. McKinley, 99 N. Y. 353, 358, 2 N. E. 9; Fechheimer v. Baum (C. C.) 37 Fed. 167, 177, 2 L. R. A. 153; In re Weil (D. C.) 111 Fed. 897, 898; In re Epstein (D. C.) 109 Fed. 874, 876; Bliss v. Sickles, 142 N. Y. 647, 36 N. E. 1064; Loveland on Bankruptcy (3d Ed.) § 152b.

It is further to be observed of these decisions that, where it is shown that the representations are falsely and fraudulently made, they are to be treated as having been made with that intent to each of the persons addressed precisely the same as if each person had been singled out and so sought to be influenced. In Genessee Sav. Bank v. Mich. Barge Co., the Supreme Court of Michigan in expressing its approval of the language employed in Eaton, Cole & Burnham v. Avery, supra, quoted the following from that decision (52 Mich. 170, 17 N. W. 793):

" * * * And, if a merchant furnishes to such an agency a willfully false statement of his circumstances or pecuniary ability, with intent to obtain a standing and credit to which he knows that he is not justly entitled, and thus to defraud whoever may resort to the agency, and in reliance upon the false information there lodged extend a credit to him, there is no reason why his liability to any party defrauded by those means should not be the same as if he had made the false representation directly to the party injured."

The facts of the decisions thus far cited concern sales of articles or loans of money to the person making the report to the mercantile agency, and upon which reliance was placed by the sellers or lenders. It is not difficult, however, to conceive that it would be to the interest of business concerns whether owned by individuals or corporations to employ mercantile agencies as the means of communicating to others not merely responsibility in relation to desired purchases and loans, but also to attract dealers in investments and investors themselves. We think this conception is justified in this particular case, both by the report and the evidence adduced. In addition to the other features of the report which are obviously adapted to inspire confidence in the financial stability of the company, the report contains these statements (in substance): That about half the authorized shares had been subscribed, also that "Ben Howe, the president, states that there has been actually paid in cash $250,000, * * * claims that the entire capital of $500,000 will be paid up within the next two weeks." While the statements are not in terms expressive of a desire to sell stock, it cannot escape attention either (1) that all of the company's stock had not been taken; or (2) that the language was calculated to induce purchases of stock. But we now know that Howe was then wishing to sell treasury stock. In his testimony he stated:

"Q. Did you tell Mr. Davis that the company was desperately in need of money when you asked him to put in $5,000? A. That was one of the reasons I was trying to get subscribers for stock.

"Q. Do I understand you to say that the New Howe Manufacturing Company was in need of money or ready cash to pay its debts or run its business in the fall of 1903? A. We were, or we would not have been trying to get stock subscriptions.

"Q. In August and September, 1903? A. Yes, sir."

Now, wherever it is necessary to determine the scope of a given representation, of course, the intent and object of the one making it must be considered. Manifestly this company needed money and desired to sell stock to obtain it. Naturally it would not, and in truth it did not, confine its efforts to sell stock simply to persons from whom it might expect to buy materials or obtain loans. Why then should this report be so interpreted as to restrict the object of the company to an effort merely to establish a basis of credit? The company certainly had as much authority to sell treasury stock as it had to purchase materials or borrow money; indeed, at the time of making the report, it does not seem that the company was any more anxious to acquire a basis of credit than it was to obtain money through sales of stock. It is therefore not too much to say that one of the purposes of the report was to influence sales of stock.

Can the report then be regarded as having been addressed to persons desiring to buy treasury stock, but who were not patrons of the mercantile agency? The answer may, we think, be aided by the testimony. Saunders testified:

"Q. When statements such as these are made by business concerns to your agency, what is customarily done with them by you? A. Well, they are placed on record for the purpose of giving them to inquirers.

"Q. For what purpose do you furnish these reports, or copies of your records to applicants? A. Well, that is a pretty hard question for me to answer, because I do not know what use the people inquiring want to make of them. They are supposed to be for the purpose of determining credit. Maybe it ain't always that way.

"Q. How long has R. G. Dun & Co. been in this business? A. Since 1841.

"Q. Do persons who furnish facts to your agency for the purposes which you have named do so with any knowledge that such statements will be communicated by your agency to any other persons? A. Yes, sir; invariably. All statements are made as a basis for credit."

This testimony was received subject to objection, and, although courts are accustomed to take judicial notice of the methods of mercantile agencies, we see no reason why such knowledge may not be supplemented respecting disputed features of their methods of business by the testimony of experienced officers of the agencies themselves.

It is to be observed that the witness said that such statements are made "as a basis for credit"; but he also stated that they are placed on record for the purpose of giving them to "inquirers." It is urged that "inquirers" must be limited to patrons. The witness did not state any such limitation. Further, it does not appear that the persons making reports to the agencies impose any restrictions in this regard. It may be assumed that the primary object of the agency is profit; but even in this view it seems that the agency gathering the information, not those giving it, determines the conditions upon which it will be given circulation. Why, then, may not an agency rightfully give information so obtained to third persons generally, and upon such terms as the agency may choose to exact? Is not that in truth the ordinary course pursued by such agencies? Plainly it is consistent with the evidence that the reports "are placed on record for the purpose of giving them to inquirers."

If the agency had chosen to furnish Davis directly with a copy of the report, no matter on what terms, it is hard to see what reason the company would have to complain. The most that can be said in its behalf is that the agency did not furnish Davis with a copy. What happened was that Davis requested Chess to investigate, Davis testifying, "I was not in position to investigate this matter and would like to have him (Chess) investigate it for me." Later Chess did investigate; and as a result turned over to Davis a letter he had received from Mr. Jefferson, together with a copy of the report in dispute, and Davis testified that he relied on this report as well as the letter in purchasing the stock. Chess made the investigation both because of his interest in Davis and of his purpose to loan Davis half of the money necessary to buy the stock. But the last analysis of the situation would seem to be that Chess undertook the investigation as the agent of Davis.

Now, it may be conceded that Davis could not have treated the report as addressed to him, if he had come into possession of it wrongfully. But can it be justly said as between him and the bankrupt company that he did obtain the report wrongfully? Surely he did not do so as to the portion of the report which purported to be based on the articles of incorporation. In that portion it is stated in substance that 2,430 shares of the stock had been subscribed by persons there named. The articles had been recorded in the office of the clerk of the Jefferson county court, and were obviously addressed to the public.

In Emerson v. Steel & Spring Co., 100 Mich. 127, 132, 58 N. W. 659, 660, it appeared that the report of a mercantile agency had been based upon sworn reports of the company to the Secretary of State; and Montgomery, J., having occasion to pass upon an attachment in dispute, said:

"The next question was whether there were grounds for attachment. We think there was sufficient to show that the indebtedness was fraudulently contracted. It sufficiently appears that Dun's reports were based upon the sworn reports of the company to the Secretary of State, that both the plaintiffs in attachment extended credit upon the strength of these reports, and we are satisfied that these statements of the company were false, and could have been made with no other purpose than that of establishing a false credit."

It is true that the question there involved differed from the one now under discussion; but the point of the reference is that notice of a report addressed to the public may be acquired through the medium of a report of a mercantile agency, and that action may be rightfully taken upon the faith of the information so derived. As to the rest of the report, it is to be constantly borne in mind, as before pointed out, that the report is made to the mercantile agency for the very purpose of having its contents communicated to others; that is, as testified in this case, to "inquirers." Such a report cannot in the nature of things be of any sort of consequence to the mercantile agency, except only as the agency may itself choose to exhibit the report. It is not the case of one person authorizing another to make representations to a specified third person, for there the use to be made of the representations is expressly limited by the person making them.

But, according to the testimony in this case, the report was turned over to the mercantile agency with authority to dispose of it, indeed to sell it, upon such terms and to such persons as it might determine. How does this differ in principle from the law as laid down in the old case of Scott v. Dixon, decided by the Queen's Bench in 1859 and reported in 29 L. J. (Ex.) 62, note?

In that case a report in writing was made by directors of a bank and addressed expressly to the shareholders, but it was left at the bank, and copies could be had by sharebrokers or anybody applying for them who was desirous of information in regard to the affairs of the bank with a view to purchasing shares. Plaintiff Scott obtained a copy through a broker, and he and the other plaintiffs afterward purchased shares in their joint names. The report was held to be a representation made to persons other than the shareholders. Lord Campbell said:

"The next point which we have to consider is, Was this representation made to the plaintiffs? Upon that I cannot entertain the slightest doubt. Reports of joint-stock companies, though addressed to the shareholders, are generally meant for the information of all who are likely to have dealings with the company, and I have no doubt that the directors in the present case knew that this particular report would a few hours after its publication be in the hands of all sharebrokers in Liverpool, and that it would be acted on by those who had or wished to have dealings with the bank. But, moreover, we have here positive evidence that it was to be bought by any person who wished to become a purchaser of shares, and it thus came into the hands of the plaintiffs, and the plaintiffs by the perusal of it were induced to buy shares in the bank. I have therefore no doubt whatever that the allegation in the declaration that that representation was made to the plaintiffs is most completely established. * * *"

In Peek v. Gurney, L. R. 6 App. 377, Lord Chelmsford approved of the decision in Scott v. Dixon, distinguishing it from the famous case in which he was then delivering his opinion, in the following language (397):

"* * * An action was brought against a director of a banking company for falsely, fraudulently, and deceitfully publishing and representing to the plaintiffs that a dividend was about to be paid out of the profits, which were sufficient for payment of the dividend, and that the shares were a safe investment for the money. The plaintiffs bought their shares upon the faith of a report made by the directors to the shareholders which contained the false representations. Copies of this report were left at the bank, and were to be had by sharebrokers or any persons applying for it, who were desirous of information with regard to the affairs of the bank, with a view to the purchase of shares. The plaintiffs purchased at the bank, through their broker, a copy of the report. The Court of Queen's Bench held that there being positive evidence that the report was to be bought by any person who thought of becoming a purchaser of shares, and that it came into the hands of the plaintiffs in this manner, and by the perusal of it they were induced to buy shares in the bank, there was a publication to the plaintiff in the sense of the declaration. I do not doubt the propriety of this decision. The report, though originally made to the shareholders, was intended for the information of all persons who were disposed to deal in shares; and the representation must be regarded as having been made not indirectly, but directly to each person who obtained the report from the bank where it was publicly announced it was to be bought, in the same manner as if it had been personally delivered to him by the director."

The doctrine of Scott v. Dixon was approved by this court in Hindman v. First Nat. Bank, 112 Fed. 931, 943, 50 C. C. A. 623, 57 L. R. A. 108. It is true that in that case this court held that a certificate of a bank showing that a certain deposit of money had been made and filed with the state insurance commissioner, in form as required by the law of Kentucky, was a representation intended only to influence the commissioner; and, further, that the fact that it was the duty of the commissioner on demand to furnish copies of the certificate to any of the public, and also to include the certificate in his official report, did not change the character of the representation. But we think that was far from holding that a report like the one in question would not have a broader scope than that of the bank certificate then under consideration.

There is another class of decisions which seems to us to lend analogy to the question under discussion. Those decisions concern liability growing out of representations made by corporate officers touching the financial condition of their companies and sent to some state or federal official and subsequently published in pursuance of statutory requirement. One of the decisions alluded to is Warfield v. Clark, 118 Iowa, 69, 91 N. W. 833. That action was based upon a false statement of the financial condition of an insurance company. The Iowa Code required such statements to be filed with the Auditor of State, setting out certain prescribed data, also that the Auditor should arrange the information contained in the statement and report the result to the Governor, and also that these reports should be printed and distributed as part of the annual report of the Auditor, and, further, that the companies themselves should annually publish a certificate showing their aggregate amount of assets and liabilities. The plaintiff bought stock in the Des Moines Insurance Company from stockholders on the faith of reports of this character, and afterward brought an action of deceit against the secretary upon the ground that the reports so made and published were false and fraudulent. Say the court at page 72 of 118 Iowa, at page 835 of 91 N. W.:

"Insurance companies know that their reports are thus made public, and it is not going too far to say that they make them as favorable to their interests as the facts will warrant, for the express purpose of inducing public confidence, and by so doing to increase the volume of their business. * * * It is said, however, that in the purchase of stock from a third person the plaintiff had no right to rely upon the representations made in the statement sworn to and filed by the defendant. If the defendant in fact falsely reported the financial condition of his company for the purpose of deceiving the public in relation to its responsibility as an insurer, it seems clear to us that we should not say as a matter of law that he only intended to wrong that particular class, and that those dealing in its stocks were not his intended victims; for he knew that stock in such companies was often bought and sold, and that reliance might be placed upon his sworn statement by those dealing therein.

See, also, Gerner v. Mosher, 58 Neb. 135, 146, 78 N. W. 384, 46 L. R. A. 244; Merchants' Nat. Bank of Hillsboro v. Thoms & Brenneman, Executors, 28 Wkly. Law Bul. (Cincinnati Superior Court per Judge Rufus B. Smith) 164, 168; Genessee Sav. Bank v. Mich. Barge Co., supra; Silberman v. Munroe, 104 Mich. 352, 62 N. W. 555. See

particularly Graves, etc., v. Lebanon National Bank, 10 Bush (Ky.) 23, 19 Am. Rep. 50, where the bank was directly affected.

The relevance of these decisions as they seem to us is that the persons making the representations did so with knowledge not merely that the particular officer to whom they would be addressed would be advised of their contents, but also that their substance would be published to all who might wish to deal with the companies and in its stocks. How can one escape the charge that he contemplated the effect such representations would have upon others at the very time he made them? As it seems to us, therefore, it is immaterial whether representations are made voluntarily or in obedience to law, wherever they are put out with general authority in some agency to make publication of them to third persons, in such manner and to such extent as the agency shall desire.

We do not overlook Irish-American Bank v. Ludlum, 49 Minn. 344, 51 N. W. 1046, relied on by counsel for the trustee. In that case one Thompson appeared to have sold notes to the bank, which had been made to his order by the New York Pie Company. The bank brought suit on the notes against Ludlum, as owner of the pie company. At the trial, Thompson testified that he was a subscriber to the commercial agency of Dun & Co. and had "called for and received a report from it" upon the pie company. This, it should be observed, may have been (though this does not expressly appear) a special report made to him personally, and not a copy of the company record. He stated that he had lost this report, but could state its contents, and was permitted against objection to do so. The cashier of the bank was under objection allowed to testify that before receiving the notes he had been informed by Thompson of the nature and contents of the report of the agency, and believed in and relied upon the report in accepting the notes. It was held that this testimony "should have been excluded as immaterial and incompetent." If it was meant by this ruling to hold, as in fact the court did in substance say, that representations made to a mercantile agency are intended only for its patrons, we are not disposed to follow it, especially upon a comparison of its facts with the facts disclosed in the present case. Indeed, we are constrained to hold under the evidence of the present case that Davis was so connected with the representations in dispute as to entitle him to place faith in and rely upon them.

Treating the report then as admissible, we must next inquire into its alleged falsity. It cannot be expected that we shall discuss the vast amount of evidence in detail, which bears upon this report. We shall state some of our conclusions. In the first place, the subscriptions to capital stock were not in truth made according to the only inference that could be drawn either from the articles of incorporation themselves or as they are stated in the report to the mercantile agency. It cannot be pretended that T. L. Jefferson made a bona fide subscription for 1,150 shares as there represented. He testified that he only intended to subscribe for 250 shares for himself and 200 for his son Floyd Jefferson, and that he was induced to make the additional subscription on statements made by Howe that certain shares had been

practically taken, and that those sales should be made out of Jefferson's nominal portion. Jefferson also stated substantially the same thing respecting the apparent subscription of R. W. Bingham for 255 shares. The total number of shares apparently taken was 2,430. Immediately following the list of subscriptions is the statement said to have been made by Howe "that there has been actually paid in cash $250,000." The evidence does not warrant any such statement.' It was not true. Another statement purporting to have been made by Howe was "that the company has purchased a wholesale plumbing and steam fitting supply business, for which they paid $150,000." As we understand the evidence, we are bound to say as to the payment of $150,000 that this statement was equally untrue. What warrant Howe had for the claim ascribed to him that "the entire capital of $500,000 will be paid up within the next two weeks" is not shown. This may in one sense be said to have been an opinion rather than a statement of a fact, but it certainly was an unwarranted forecast. If the features of the report so pointed out as not sustainable under the evidence had been omitted, the report would hardly have been calculated to influence either sales of merchandise or loans of money, much less investments in the stock. It is therefore not necessary to compare the rest of the report with the evidence. Why should such a report have been made; why should it not have been explained? It is said that Howe denied making the report. But, so far as we can discover, Howe did not in his testimony allude to the report. He did make one statement that is inconsistent with one portion of the report. He testified:

"Q. I will ask you to state whether or not you told Mr. Davis, or any one else, that the new Howe Manufacturing Company had bought the plant of T. A. Vogel & Sons, or the jobbing house in Birmingham, Ala. A. No, sir; I never told no one that in my life. Q. As I understand, you had an option on it? A. Yes, sir; an option on it, I never told any one that I ever bought it."

But it surpasses our understanding why Howe would not directly and emphatically have denied the representations contained in the report, if in truth they had not been made.

It follows that there was error in excluding the report, and that the report must be treated as having been designed fraudulently to influence the sale of stock in question. While it is true that Davis testified as before pointed out that he was influenced both by the report and the letter of Jefferson, we see no escape from the conclusion that the effect of the report alone was sufficient to entitle Davis to rescind the contract, unless he was guilty of laches in repudiating it. This conclusion renders it unnecessary to consider the part that Jefferson is said to have taken toward influencing the sale of stock. We have no hesitation in finding that, whatever Jefferson did, he did not do in an official capacity or as an agent engaged in the transaction of the business of the company. The company did not deal with Davis through Jefferson. It dealt with him through Howe, its president. The company can claim title to the money it received for the stock only through the acts of Howe and Davis. We therefore see no reason or room for introducing Jefferson into the transaction for the purpose of binding the company.

Had Davis through acquiescence and delay lost his right to rescind? If we were to consider merely the lapse of time between the purchase of the stock and the repudiation of the contract, a period of three years, it would seem under some of the decided cases that Davis should have ascertained his rights and taken action earlier. But as a rule the facts offered in support of defenses of laches vary so greatly that it is not ordinarily helpful to employ results reached in one case to determine the result that should be reached in another. There is, however, one principle pervading all the decisions that cannot be avoided here. It is that the defense of laches will not be entertained, unless it is made to appear that it would be inequitable to deny it. As observed by Justice Brewer in Galliher v. Cadwell, 145 U. S. 368, 372, 12 Sup. Ct. 873, 874, 36 L. Ed. 738, when speaking of the cases in which this defense had been invoked:

"It is true that by reason of their differences of fact no one case becomes an exact precedent for another, yet a uniform principle pervades them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that because of the change in condition or relations during this period of delay it would be an injustice to the latter to permit him to now assert them."

After commenting upon some of the decisions the learned justice proceeded at page 373 of 145 U. S., at page 875 of 12 Sup. Ct. (36 L. Ed. 738):

"But it is unnecessary to multiply cases. They all proceeded upon the theory that laches is not like limitation, a mere matter of time: but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties."

See, also, Ward v. Sherman, 192 U. S. 168, 176, 24 Sup. Ct. 227, 48 L. Ed. 391; Stevens v. Grand Central Min. Co., 133 Fed. (8th Circuit) 28, 31, 67 C. C. A. 284; Cook on Corp. §§ 161, 162. An instance of allowing the defense of laches against a subscriber to corporate stock, who had not been "vigilant in discovering such fraud and in repudiating his contract," appears in Chubb v. Upton, 95 U. S. 655, 667, 24 L. Ed. 523, where under the facts it would have been inequitable to enforce the subscriber's rights. In G. A. Joslin v. Cadillac Auto Co. (Sixth Circuit) 177 Fed. 863, 869, it was stated by Judge Knappen:

"Acquiescence and waiver are always questions of fact, and, where set up to defeat rescission, the burden is upon the defendant to make it out. Mudsill Mining Co. v. Watrous (6th Circuit) 61 Fed. 163, 186, 188, 9 C. C. A. 415; Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420."

As we understand the evidence, practically all the claims of creditors of the bankrupt company have been purchased by Howe and are held under some arrangement between him and Jefferson and the Western National Bank; and we are impressed with the belief that those parties, unlike the original creditors, parted with their money with notice of the claim now in dispute. Nor do we understand that the rights of any present stockholders were acquired without notice of this

claim; and, further, we do not discover anything tending to show that the assets are sufficient to admit of payment of a dividend to stockholders in any event. There is no secondary or double liability of the stockholders. But, apart from these considerations, we are not convinced that the trustee has discharged the burden of showing that Davis either gained knowledge of the true conditions under which he purchased his stock, or that his relations to the company were of a character rightly to justify us in imputing to him or otherwise charging him with such knowledge, prior to March, 1906, when the "four-cornered agreement" mentioned in the statement was entered into; and we think that he thereupon investigated into the facts and pursued the remedies open to him with reasonable diligence.

What has been said must, of course, result in permitting Davis to prove his loss for the sum of $5,000 with interest from July 27, 1906, the date of the rescission. But we cannot in this proceeding accord priority to the claim as was ultimately allowed by the referee. The referee ordered that the claim should be paid in full before any distribution of the estate should be made to Jefferson, Howe, or the Western National Bank. Our attention has not been called to any decision in which such priority was granted in a proceeding of this character. We do not see how such an order could be allowed without in effect determining the ultimate rights between Davis on the one hand and each of the parties named on the other. We do not think that the proceeding is in condition to admit of such an order. It is true that the proceeding is of an equitable character, and that the creditors named have voluntarily become parties to it. But no such issues have been formulated and presented as to enable the court properly to hear and determine the rights of Davis against the other persons named either severally or jointly. Such rights as Davis urges against them would ordinarily be enforced against them separately in actions for deceit. The evidence offered in the present proceeding might be admissible in each of those cases; but it is by no means certain that all of the evidence which the parties might wish and be entitled to produce is to be found in the present record.

The order of the court below will be reversed with direction to cause an order to be entered allowing the claim of Davis as a general claim with interest from July 27, 1906 (the date of rescission and demand), until the date of filing the petition in bankruptcy, against the estate of the bankrupt, and awarding to him his costs. Bankr. Act July 1, 1898, c. 541, § 1, subd. 10, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3419); Id., § 63, 30 Stat. 563; rule 21, Gen. Orders Bankr. (89 Fed. ix; 32 C. C. A. xxii); Loveland on Bankr. (3d Ed.) § 117; Lowell on Bankr. § 198; Sloan v. Lewis, 22 Wall. 150, 156, 22 L. Ed. 832; In the matter of Freeman Orne, 1 Ben. 361, 364, Fed. Cas. No. 10,581.