BARBER *v.* WHITAKER MANUFACTURING COMPANY.

Opinion delivered October 21, 1929.

*June P. Wooten,* for appellant.

*Carmichael & Hendricks,* for appellee.

SMITH, J. The Turner-Shannon Company, a corporation engaged in the mercantile business in Little Rock, made an assignment on January 12, 1928, for the benefit of its creditors. The Whitaker Manufacturing Company, of Chicago, was the largest commercial creditor, and, upon being advised of the assignment, sought to recover certain specific merchandise then on hand. The court sustained the creditor's intervention, but an order was made that all the goods be sold, and that the Whitaker Company be paid the sum of $1,000 out of the proceeds of the sale in satisfaction of this demand. The assignee resisted the creditor's demand for the return of its merchandise, and has appealed from the order of the court awarding it $1,000.

In the intervention filed by the Whitaker Company it was alleged that its debtor had on hand certain merchandise which it could and did identify, and it alleged that the sale of these goods had been induced by the false and fraudulent representation of the debtor that it was solvent when the goods were bought and shipped, when, in truth and in fact, it was hopelessly insolvent, and known so to be by the managing officers of the debtor.

The Turner-Shannon Company, hereinafter referred to as the assignor, had been for several years a customer of the Whitaker Company, hereinafter referred to as the creditor, and had bought goods from the creditor on the customary commercial credit. The assignor had been slow in its payments, but, after some delay, had always made them, except that, at the beginning of 1927, there was a small balance overdue and unpaid, which consisted principally of interest which had accrued on the delayed payments.

On January 28, 1927, the assignor placed an order for merchandise amounting to $6,103.55, which was a very much larger order than any of the previous orders had been. Upon investigation the creditor found that the assignor's rating in the commercial reporting agencies had been withdrawn, and the assignor was called upon for a financial statement as a condition precedent to filling the order. A lengthy correspondence ensued, during the course of which the creditor wrote letters dated as follows: February 12, February 23, March 19, April 19, and April 26, 1927. Early in the correspondence the creditor sent a commercial blank, which, if filled in with appropriate answers, would have conveyed specific and required information as to the assignor's financial condition and solvency. No response was made to this request, and in a subsequent letter a second blank was forwarded, with the request that it be filled in and returned.

Without setting out the correspondence, which is somewhat lengthy, it may be said that the point had been reached when it was apparent that the order would not be filled without the required showing being made. The correspondence had then covered a period of about four months, and on April 30, 1927, the assignor wrote a letter, which, as it is pivotal, is quoted from somewhat extensively:

"I have your communication of the 26th, and in reply wish to give you the following information: You

shipped us our requirements in repairs in 1925, also 1926, and our financial condition was no better in 1926 than 1925, and yet in 1927 you have refused to supply us because we cannot furnish you a financial statement of our present condition. We take inventory during the month of June, and our year is from July 1 to June 30. Our financial condition is a great deal better by about $45,000 now than it was July 1, 1926, yet our contract is being held up, because we cannot give you a financial statement of our affairs. We cannot close our house and go to taking inventory now. We will give you a statement between July 1 and 10, and see no reason in the world why you should not okeh our order for repairs and let them come forward.''

After explaining that assignor's commercial rating had been withdrawn on account of some trouble which had arisen with the manager of a branch business in another city, in which the assignor was interested, the writer proceeded to say:

''I failed to find their reason for so doing (withdrawing the rating). Believe, however, if you will correspond with Mr. Howard Tune, city manager here for Bradstreet's, he will be glad to give you any satisfactory information about this concern you want. As to the small balance due you, we will be able to pay this in the next thirty days.''

The writer then explained that an unprecedented flood had brought great damage in the assignor's trade territory, and had delayed expected collections. The letter concluded with the following statement:

''If you cannot okeh all the contract, will you okeh half of it? We are almost out of repairs. Or would you think it best to order as we need the merchandise, and pay for it as we get it? We perhaps could manage it this way. We are willing to do anything in the world that is fair, and see no reason why you should not be willing to do the same thing, and feel that you are.''

The president of the creditor company testified that the previous dealings of his company with the assignor had been of such character as to induce the belief, which was, in fact, entertained, that the statements of the writer of the letter could be relied upon, and that, relying upon this letter as reflecting the financial condition of the assignor, he ordered the goods shipped, and they were forwarded in due course. Payments were made on this order and on the balance due when the order was filled, which reduced the account to $4,724.27.

When the assignment was made, the creditor sought to recover certain merchandise shipped in this last order, for the reasons heretofore stated, but the order was resisted by the assignee upon the ground that to permit the recovery of these goods would operate to give a preference over other creditors, and it was insisted that all the goods on hand should be sold for the benefit of all the creditors, and the proceeds of the sale divided pro rata.

The assignee insists that the assignor made no material or untrue representation upon the faith of which the sale was made, and that the testimony does not show any intention on the part of the assignor, existing at the time the order was given and filled, not to pay for the goods. In support of this contention it is argued that the creditor, in filling the order, was "taking a chance," and that knowledge that a chance was being taken will be imputed from the facts that the assignor's commercial rating had been withdrawn, and that a formal statement was refused and never furnished, although this requirement was the subject-matter of the correspondence which was conducted for about four months.

A representative of the creditor testified that after the assignment he called upon the managing officer of the assignor and discussed its affairs, and that in the course of the conversation it was admitted by the writer of the letter of April 30 that it was known when the letter was written that the assignor was then insolvent. This conversation was denied. But, whether it occurred

or not, we think it certain that the debtor was then insolvent, and this fact must have been known to any one cognizant of the assignor's affairs. It was hopelessly insolvent when the assignment was made less than a year later, and no great change occurred in its financial condition, although it became gradually worse.

The report of the assignee, when filed, showed an indebtedness of about $135,000, and assets of various kinds, including the accounts, were supposed to be worth about $35,000. At the first offering of these assets for sale by the assignee a bid of only $3,500 was received, and they were later sold for $5,000, although the assignee testified that they were worth $15,000, and could have been sold privately for that amount.

The president of the creditor company testified that, before filling the order, he examined the last commercial agency report on the assignor, which showed a surplus of $23,000, but, as no current report was available, he did not rely upon the report which he examined, and was only induced to fill the order by reason of the statement contained in the letter of April 30, and, as this letter contained the statement that the assignor's affairs had been improved to the extent of $45,000, he assumed that a surplus of $68,000 then existed or was claimed. We think this inference was fairly deducible from the letter, and we find nothing in the record which would warrant us in disregarding the testimony of the creditor's president that he let the order be filled in reliance thereon.

The statement contained in the letter in regard to the $45,000 was not a candid one, and its implication was false, and caused an erroneous impression, whether that result was intended or not. The facts in regard to the $45,000 are these: The president of the company, who had ceased to be a resident of Little Rock, and was not active in the assignor's affairs, was advised of its distress, and he advanced $10,000 in cash. He agreed to assume personally $15,000 of its obligations, but it was not shown that he had done so. Another stockholder,

who was not active in the management of the assignor's affairs, agreed to and did assume personally the payment of the interest account due a bank of $20,000. Had the president assumed the $15,000, these transactions combined would not have operated to reduce the assignor's liabilities as the letter implied had been done. The only effect of these transactions would have been to transfer that much of the assignor's indebtedness to more indulgent creditors.

The assignor's managing officer testified that there was no intention to defraud, and it is earnestly insisted that there was no testimony to the contrary, as it was sincerely believed that if indulgence were extended the debts could and would be finally paid.

We do not make the finding that any intent to defraud was shown, but it is not essential that such intent be shown to affirm the decree here appealed from. We do find the facts to be that the assignor was insolvent when the order was given and filled, and that an untrue statement as to the assignor's finances was made, which was relied upon and which induced the extension of the credit.

The law of the case stated is well settled by numerous decisions of this and other courts.

The case of *In re Epstein*, 109 Fed. 874, was one in which it was alleged that a bankrupt had knowingly made false statements of his assets and liabilities in his report to a commercial agency, upon the faith of which a wholesaler had extended credit. Suit was brought by the wholesaler to rescind the sale and to recover the goods, and, in declaring the law applicable to these conditions, Judge Trieber said:

"Had the intervener relied solely on the fact that these goods were obtained by the bankrupt with the fraudulent intent not to pay for them, perhaps this contention would be correct; but, as rescission is also asked upon the ground that the goods were obtained upon the misrepresentations of the bankrupt, who concealed the fact that at the time he was indebted to his father and

children in the sum of $5,500, the question to be determined is whether such misrepresentations, although not made in bad faith, nor with a fraudulent intent, are sufficient to entitle the vendor, who acted promptly upon the discovery of the true facts, to a rescission. There is no pretense that the bankrupt did not know of this indebtedness at the time, nor is it contended that the amount of these debts was not very material, in view of the real assets of the bankrupt. In such case the intent is immaterial. If a buyer knowingly makes false representations concerning material facts, and thus induces the seller to part with his goods, the seller may elect to avoid the sale, and this without regard to whether the buyer intended to pay for the goods or not. The fraud in such case consists in inducing the vendor to part with his goods by false statements to the buyer, known to be false when made, or made by him when he has no reasonable ground to believe that they are not true. When the bankrupt made his statements to the commercial agencies, he knew that they were intended to be furnished to the wholesale trade for the purpose of determining a basis of credit for him. Intervener, before filling the orders of the bankrupt, obtained copies of these statements, and, no doubt, in reliance upon the truth of these statements, the goods were sold and delivered. That a sale induced by such false representations may be rescinded, although the purchaser made them with no fraudulent intent, is well settled.''

Among the Arkansas cases cited by the learned jurist, along with the cases from other jurisdictions, in support of the statement of the law there made, were those of *Bugg* v. *Shoe Co.,* 64 Ark. 12, 40 S. W. 134, and *Johnson Co.* v. *Triplett,* 66 Ark. 233, 50 S. W. 455. These cases fully sustain the rule announced.

In the Bugg case Mr. Justice RIDDICK said: ''Nor can we sustain the contention of appellant that to entitle the vendor to avoid a sale after delivery it must in all cases be shown that the vendee did not intend to pay for

the goods. That is, as above stated, one ground on which the sale may be avoided, but not the only one. If the vendee knowingly makes false representations concerning material facts, and thus induces the seller to part with his goods, the seller may elect to avoid the sale, and this without regard to whether the buyer intended to pay for the goods or not. The fraud in such case consists in inducing the vendor to part with his goods by false statements of the buyer, known to be false when made, or made by him when he has no reasonable ground to believe that they are true.''

Further citation of authorities is unnecessary, as the cases are both numerous and harmonious.

The decree is correct, and is affirmed.